UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL S. FRAZIER,                    )
                                       )
                    Plaintiff,         )
                                       )
              v.                       )      No.  4:05CV1025 SNL
                                       )                    (TIA)
JO ANNE B. BARNHART, Commissioner      )
of Social Security,                    )
                                       )
                    Defendant.         )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  All

pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636(b) for appropriate disposition.

**I.      Procedural History**

On November 27, 2002, Claimant Michael S. Frazier filed an application for Disability

Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq.  (Tr.

53-55).[1]  On February 28, 2003, Claimant filed an application for Supplemental Security Income

payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 287-

90).  In his applications for benefits, Claimant alleged that he has been disabled since October 2,

2002, due to degenerative disc disease.  (Tr. 68-69).  The Social Security Administration denied

Claimant's claims for benefits.  (Tr. 26-30, 293-97).  Claimant requested a hearing before an

_____

[1]"Tr." refers to the page of the administrative record filed by the defendant with its Answer
(Docket No. 12/filed September 6, 2005).

Administrative Law Judge ("ALJ").  (Tr. 35-39).  On September 14, 2004, a hearing was held

before an ALJ.  (Tr. 331-63).  Claimant testified and was represented by counsel.  (Id.).  Dr.

Darrell Taylor, Ph.D., a vocational expert, also testified at the hearing.  (Tr. 354-62).  Thereafter,

on February 11, 2005, the ALJ issued a decision denying Claimant's claims for benefits.  (Tr. 14-

23).  On April 27, 2005, the Appeals Council found no basis for changing the ALJ's decision after

considering the additional evidence received and denied Claimant's request for review of the

ALJ's decision.  (Tr. 5-7A, 305-330).  The ALJ's determination thus stands as the final decision of

the Commissioner.  42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on September 14, 2004

#### 1.  Claimant's Testimony

At the hearing on September 14, 2004, Claimant testified in response to questions posed

by the ALJ and counsel.  (Tr. 334-53).  Claimant testified that he stands at five feet nine inches

and weighs 230 pounds.  (Tr. 350).  Claimant testified that he lives with his wife and almost three-

year old son.  (Tr. 345).  His wife attends school for three hours a day Monday through Friday.

(Tr. 345).  Claimant cares for his son while his wife attends classes by changing his diaper and

feeding him, but he does not lift his son.  (Tr. 345-46).

Claimant testified that he last worked as a welder in 2001.  (Tr. 334).  Claimant had

worked as a welder for nine and a half years.  (Tr. 335).  Prior to working as a welder, Claimant

worked as a general laborer on construction crews.  (Tr. 335).  Claimant testified between 1996

and 1998, he worked a "statute builder" building yard statutes out of concrete.  (Tr. 336).

Claimant also worked as a forklift driver moving parts he needed to weld.  (Tr. 336).  Claimant

worked as a trash truck driver operating a front end loader to load trash into semi trailers.  (Tr. 336-37).  From October 1994 through February 1995, Claimant worked as a dump truck driver in a quarry and before that time, he worked as a fish baler in a fish barn.  (Tr. 337).  Claimant testified that he was injured in his last job and has filed a Worker's Compensation claim which is pending.  (Tr. 338).  Claimant testified that he has not been offered vocational rehabilitation, and there has not been a permanent stationary report.  (Tr. 338).

Claimant testified that he has been seeing Dr. Cadiz for over a year for the pain covering his entire back.  (Tr. 339).  In particular, Claimant noted that he has constant pain in his thoracic spine, and  he experiences pain every second of each day.  (Tr. 339-40).  Claimant rated his lower back pain at a nine and his upper back pain at a five.  (Tr. 340).  Claimant described the pain as radiating beyond his back through his arms and legs every day.  (Tr. 341).  Claimant testified that the pain radiates more in his legs than his arms.  Claimant has pain in his legs five times a month and the last three days, he has experienced consistent pain in both of his legs.  In the last few days, he has experienced pain in his arms one day.  (Tr. 341).  Claimant testified that he takes Lorcet three times a day, Soma once a day, and muscle relaxers for his pain, and he experiences no side effects from his medications.  (Tr. 342).

Claimant testified that the pain limits his activities by limiting his ability to lift and carry thirty to thirty-five pounds, by limiting his ability to sit to ten to fifteen minutes, and by limiting his ability to walk twenty feet.  (Tr. 342-43).  Claimant testified that he can lift thirty to thirty-five pounds based on his ability to lift his son.  (Tr. 353).  Claimant uses a cane, and he switches the cane from hand to hand.  (Tr. 343-44).  Claimant testified that he experiences pain with postural movements including bending, twisting, turning, crawling, and climbing.  (Tr. 344).  Depending

- 3 -

upon the work activity, Claimant can work for thirty minutes before he has to stop.  Claimant

testified that he may have to lie down for a couple of hours or sit for a couple of minutes.  (Tr.

344).  Claimant testified that he spends two to three hours each day reclining.  (Tr. 344-45).

Claimant testified that with respect to pain management, his doctor wanted to treat him with some

more epidurals for his upper back even though the two epidurals in his lower back did not help

alleviate the pain.  (Tr. 351).  Claimant testified that on average he has seven bad days in a month.

(Tr. 352).  On a bad day, he has to be assisted with everything he does and use a cane.  (Tr. 352).


As to his daily activities, Claimant testified that he reads the Bible and Field and Stream

magazine, and he draws three hours a day.  (Tr. 346).  Claimant's wife helps him shower and

dress in the morning.  (Tr. 351).  He also watches movies and television shows on the cable

channels for two to three hours each day.  (Tr. 346-47).  Claimant testified that he is able to drive

a car, and drives on average three times a week to the store and back.  (Tr. 347).  Claimant helps

his wife with the household chores by sitting and folding clothes and wiping off tables.  (Tr.  347).

Claimant attends church services every Sunday and Wednesday for two hours alternating between

sitting and standing.  (Tr. 348, 353).  Claimant testified that he tries to go worm-bait fishing as

much as possible.  (Tr. 348).  Claimant fishes for an hour and a half to two hours alternating

between sitting and standing.  (Tr. 349).  Fishing is a stress reliever for Claimant.  (Tr. 349).

Claimant testified that he can no longer climb mountains and kick box.  (Tr. 352).  In the last year,

Claimant's wife drove the family to Alabama for vacation.  (Tr. 347).

### 2.  Testimony of Vocational Expert

Vocational Expert Darrell Taylor listened to the testimony during the hearing and

reviewed the exhibits admitted into evidence. (Tr. 334, 354). Mr. Taylor classified Claimant's past relevant work in terms of <u>Dictionary of Occupational Titles</u>. Mr. Taylor testified that Claimant worked as a construction laborer, a semiskilled heavy, exertional job with the DOT number 869.664-014; a welder, a medium skilled job with the DOT number of 811.684.-014; a trash truck driver, a medium, semiskilled job with the DOT number of 905.663-010; a hand packer, a medium skilled jog with the DOT number of 920.587-018; a concrete molder, a heavy semiskilled job with the DOT number of 777.684-010; a heavy equipment operator, a medium job with the DOT number of 859.683.-010; and a fish baler, a medium, unskilled job with the DOT number of 914.683-010. (Tr. 354-55).

The ALJ asked Mr. Taylor to assume that in the first hypothetical the same background information for a younger individual with a GED and the same prior work experience as Claimant with the limitations of light work, the ability to stand and walk two hours out of the eight-hour workday, that ability to sit six hours out of the eight-hour workday, with occasional climbing, stooping, crouching and the need to avoid vibratory tools. (Tr. 356). Based on the limitations imposed in the hypothetical, Mr. Taylor opined such individual would be precluded from performing Claimant's prior work. (Tr. 356).

Next the ALJ asked Mr. Taylor to discuss the number of light job titles a younger individual with no transferrable skills and the limitations as discussed in the above hypothetical. (Tr. 356). Mr. Taylor opined that light jobs would be eliminated unless the individual has a sit/stand option of sitting six out of the eight-hour workday available during the workday. (Tr. 356-57). Mr. Taylor found that such individual could not perform 200 of the unskilled sedentary light job titles if the individual has a sit/stand option alternately at least thirty minutes at a time.

(Tr. 357). If the sit/stand option in the range of alternating at least thirty minutes at a time is included, Mr. Taylor opined that the individual could perform several assembler census code positions, assembler sedentary, final assembler, and inspector/checker (dowel inspector) jobs. (Tr. 358-60).

Next in the second hypothetical. based on the assessment by the consultative examiner in May, 2003, the ALJ asked Mr. Taylor to assume that individual has the option to stand and walk four out of the eight-hour workday, to sit six hours out of the eight-hour workday, to bend and to stoop without restriction, to crouch, to squat and to kneel occasionally, no limitations on manipulation, and to lift twenty-five pounds on an occasional basis. (Tr. 360). Mr. Taylor opined that such individual would not be able to perform Claimant's prior work, but the individual could perform all the jobs identified in hypothetical one as well as additional sit/stand jobs at the light exertional level such a hand/fuser packer job, a light and unskilled job, assembler positions, light/unskilled positions affording the individual the option to sit/stand, a glass joiner, a light, unskilled job. (Tr. 360-61). In all of the jobs listed in the first two hypotheticals, Mr. Taylor explained that none of the jobs would require the individual to operate foot controls. (Tr. 362).

In the third hypothetical, the ALJ added Claimant's limitations of lifting thirty to thirty-five pounds, sitting for ten minutes, standing for ten to fifteen minutes, walking twenty feet, using a cane, reclining a couple of hours or sitting for a few minutes, and experiencing pain with postural movements. (Tr. 362). Mr. Taylor testified such an individual would not be able to perform any work. (Tr. 362).

### 3. Open Record

During the hearing, counsel requested to submit additional updated records from

Claimant's treating physician, Dr. Briccio Cadiz. (Tr. 333). Counsel submitted additional evidence, including Dr. Cadiz's treatment records from September 4, 2003, through September 4, 2004 and a Physical Residual Functional Capacity Questionnaire completed by Dr. Cadiz, to the ALJ before the ALJ issued his decision denying Claimant's claims for benefits. (Tr. 234-86).

### 4. Forms Completed by Claimant

In the Disability Report Adult completed on November 27, 2002, Claimant reported that he stopped working on October 2, 2002, under doctor's care. (Tr. 68-77).

In the Claimant Questionnaire completed on April 19, 2002, Claimant listed reading the Bible and fishing and hunting as the activities he enjoys. (Tr. 97-99). Claimant acknowledged that he has not received any medical treatment since he filed his applications, and he has not upcoming doctor's appointments scheduled. (Tr. 99).

## III.    Medical Records

During the initial visit to Dr. Michael Patterson, a D.O., Claimant reported experiencing increased back pain. (Tr. 123, 183). Examination revealed some tenderness of Claimant's SI joints. Dr. Patterson prescribed medications and ordered an EKG. (Tr. 123, 183). In a follow-up visit on October 2, 2002, Claimant reported pain throughout his entire back with increased intensity. (Tr. 122, 180). Examination revealed skeletal muscle tenderness over Claimant's thoracic and lumbar spine. Dr. Patterson prescribed Flexil and Panlor and ordered Claimant not to return to work until Monday. (Tr. 122, 180). On October 9, 2002, Claimant reported no relief from medications and continued low back pain. (Tr. 121, 179). Dr. Patterson ordered an x-ray of Claimant's lower spine and prescribed Percocet and ordered Claimant not to return to work for one week. (Tr. 121, 179).

Dr. Patterson issued certificates not to return to work on behalf of Claimant for October 1-6, 9-14, and 14-21, 2002 and October 24-November 7, 2002. (Tr. 184).

The MRI of Claimant's lumbar spine performed on October 9, 2002, revealed disc space narrowing of the T11/12 and T12/L1 disc spaces but otherwise unremarkable. (Tr. 118).

In a return visit on October 14, 2002, Claimant reported no relief from the Percocet. (Tr. 120, 178). Dr. Patterson ordered a MRI of Claimant's lower spine. (Tr. 120, 178). On October 24, 2002, Claimant reported continued back pain. (Tr. 119, 176). Claimant reported that the medications have not helped at all. Examination revealed increased tenderness over Claimant's SI joints and lower spine. Dr. Patterson ordered physical therapy evaluation and treatment. (Tr. 119). Dr. Patterson wrote a prescription for physical therapy three times a week for two weeks for Claimant as treatment of his lower back pain. (Tr. 119, 175).

On October 31, 2002, Susan Hooss, a physical therapist at the JMH Rehab Center, completed an initial out-patient physical therapy evaluation of Claimant. (Tr. 114, 231). Ms. Hooss included in her diagnosis low back pain with increased pain on movement. (Tr. 114, 231). Claimant reported having low back pain for several years, but the pain exacerbated one month earlier when he started working a new job. (Tr. 115, 232). Although having been prescribed Flexil and other muscle relaxers, Claimant reported that he stopped taking the medications because the medications did not help. Claimant reported being placed on no restrictions except not working by his doctor. Ms. Hooss noted that Claimant ambulates independently without an assistive device. Examination revealed that Claimant has a full range of motion of his trunk and lower extremities and good flexibility in his hamstrings, piriformis, gluts, and hip flexors. Palpation revealed no significant muscle spasms along the lumbosacral region and no tenderness

along the spinous processes of the thoracic spine but some increased tenderness along the lumbosacral spinous processes. (Tr. 115, 232). Ms. Hooss provided a progressive home exercise program for spinal stabilization with Claimant to be seen three times a week for two weeks. (Tr. 114, 231). In the assessment section, Ms. Hooss questioned whether Claimant would comply with the outpatient program, because Claimant does not believe program will be beneficial. (Tr. 115, 232). Ms. Hooss opined that Claimant would benefit if he complied with the outpatient program. (Tr. 115, 232). In a follow-up visit on November 5, 2002, Claimant reported constant pain. (Tr. 117, 230). On November 7, 2002, Claimant failed to show up for his scheduled appointment. (Tr. 117, 230). In Claimant's discharge note from treatment on November 30, 2002, Ms. Hooss cited Claimant's hospitalization in the reassessment. (Tr. 113, 229).

On November 6, 2002, Dr. Patterson admitted Claimant through the emergency room to treat his acute lower back pain. (Tr. 110-11). Dr. Patterson noted that the x-rays and MRIs showed some mild degenerative joint disease. (Tr. 111). Dr. Patterson noted that Claimant has not been able to perform his job as a laborer, because the job requires quite a bit of heavy lifting. Dr. Patterson noted that Claimant has been suffering from persistent back pain for the last two to three weeks. (Tr. 112). Dr. Patterson noted that Claimant's pain has not improved with pain medication. (Tr. 111). Although he administered Morphine and this provided relief to Claimant in the emergency room, he admitted Claimant because his pain persisted and the unmanageable nature of the pain. Dr. Patterson ordered pain management and physical therapy, and Claimant showed little improvement. (Tr. 111). Examination revealed some mild tenderness over Claimant's lumbar spine and SI joints and greater tenderness over his sacrum. (Tr. 112). Dr. Patterson released Claimant from the hospital with pain medications, OxyContin and Ativan, and

indicated that he would follow-up with pain management, either epidural or facet joint injections. (Tr. 111).

Dr. Patterson certified that Claimant had been under his care from November 8 through 15, 2002, and would be able to return to work on November 16, 2002. (Tr. 174).

In a letter dated November 18, 2002, a patient care coordinator at Pain Management Services explained to Claimant that Dr. Patterson had referred him for evaluation by Dr. Berry on November 21, 2002. (Tr. 227).

In the initial consultation at Pain Management Services on November 21, 2002, on referral by Dr. Patterson, Dr. Tad Berry evaluated Claimant for treatment. (Tr. 130). Dr. Berry noted that Claimant works as a welder and this job requires some lifting and standing. Dr. Berry listed Ativan, OxyContin, Percocet, Pamelor, and Vistaril as Claimant's medications. In the impression section, Dr. Berry noted probable discogenic pain. Dr. Berry ordered a back brace for Claimant to wear, physical therapy, and a possible repeat of closed MRI. (Tr. 130). Dr. Berry prescribed Paxil, Ativan, Vicodin, Methadone, Celebrex, and Zanflex, and ordered a closed MRI of Claimant's lumbar spine. (Tr. 218-21). Dr. Berry also prescribed a lumbar support brace and wrote a medical excuse for work for Claimant for November 17-23 and 23-29 2002. (Tr. 222-24). In a follow-up visit on November 29, 2002, Dr. Berry noted how Claimant reported participating in martial arts and fighting around 380 times between 1992 and 1998. (Tr. 133). Claimant reported being thrown to the ground a number of times during the fights, and opined that this activity might have been the onset of his upper back pain. Claimant reported upper back pain with tightness across his shoulder blades but improvement from rest and application of heat. Starting in July of that year, Claimant reported three-day episode of severe low back pain which

resolved spontaneously with bed rest and decreased activity. Onset of low back pain started again in September. Claimant reported trying physical therapy, but he stopped because of severe pain. (Tr. 133). Claimant reported being off work due to pain. (Tr. 134). Examination revealed full range of cervical spine without elicitation of symptoms. Palpation of cervical spine revealed no significant tenderness. Back examination revealed no trigger points in upper back, but some paraspinous tenderness and trigger areas at approximately L4-5 and L5-S1. (Tr. 134). Dr. Berry further noted tenderness over the PSIS areas. (Tr. 135). In the impression section, Dr. Berry opined that Claimant has severe low back pain probably discogenic, possible sacroiliac, and upper thoracic pain probably osteoarthritis. Dr. Berry started Claimant on Vicodin and continued his Ativan and Celebrex medications. Dr. Berry opined that after completion of the MRI, he might consider empirical epidural steroid injections to help alleviate Claimant's pain and placed a back brace on Claimant who reported improvement in his pain at the time of placement. (Tr. 135). In the confidential patient questionnaire, Claimant indicated that his pain started on its own, but his job aggravates the pain. (Tr. 208-17).

The MRI of Claimant's lumbar spine performed on December 16, 2002, revealed a mild disc bulge at L4-L5 producing a one to two millimeter indentation on Claimant's anterior thecal sac and a small central disc protrusion/herniation at L5-S1 producing a two to three millimeter indentation on the anterior epidural fat and thecal sac. (Tr. 125). In the impression section, Dr. David Wu, a radiologist, found Claimant to have central disc herniation/protrusion at L5-S1 and mild disc bulge at L4-L5. (Tr. 126).

In a letter dated December 19, 2002, Dr. Berry reported to Dr. Patterson how he treated Claimant during a follow-up visit for severe low back pain. (Tr. 131). Dr. Berry noted that the

open MRI revealed some degenerative changes at the L4-5, L5-S1 levels, and Claimant did have some symptoms consistent with results including severe pain with sitting and standing for prolonged periods of time and restricted range of motion in the low back area. (Tr. 131). Dr. Berry prescribed Kadian and Celebrex. (Tr. 201-04). Dr. Berry noted in his initial evaluation of November 21, 2002, Claimant exhibited an antalgic-type gait, restriction of movement of his lumbar spine, and some sacroiliac joint irritation. (Tr. 131). Dr. Berry listed probable discogenic pain as his initial impression and ordered a closed MRI. Claimant reported some benefit wearing a lumbar spine support brace for minimal activities of daily living. Claimant reported taking Vicodin, Celebrex, and Zanaflex. Claimant reported being unable to return to work. The MRI results revealed a small central disc herniation at the L5-S1 level with two to three millimeters indentation on the thecal sac and some L4-5 degenerative changes. Dr. Berry opined that Claimant has severe low back pain secondary to a herniated disc at the L5-S1 level, and he recommended that Claimant not return to work at that time. Dr. Berry recommended a trial of lumbar epidural steroid injections as treatment and a possibly evaluation by a spine surgeon if the epidural injections do not work. (Tr. 131). Dr. Berry prescribed Vicodin. (Tr. 200). Dr. Berry wrote a prescription indicating that Claimant should remain off work due to his herniated lumbar disc with intractable pain. (Tr. 205).

On December 31, 2002, Dr. Berry performed an epidural injection at Claimant's lumbar midline L-5 S1. (Tr. 195). The attending nurse indicated that Claimant tolerated the procedure well. (Tr. 196). Dr. Berry prescribed Elavil. (Tr. 199).

On January 9, 2003, Claimant was admitted to Jefferson Memorial Hospital's emergency room for treatment of his intractable low back pain stemming from his inability to keep down his

medications. (Tr. 138-39). Claimant reported being disabled. (Tr. 139). Claimant received IV fluids and discharged on January 10, 2003. (Tr. 139).

In a follow-up visit at Pain Management Services on January 21, 2003, Dr. Berry administered another injection. (Tr. 143, 191). Claimant reported doing well and experiencing baseline pain on Kadian. (Tr. 143, 191). Dr. Berry administered the epidural steroid injection at midline L5-1. (Tr. 144, 187). Dr. Berry wrote note indicating that Claimant should not return to work due a herniated disc with intractable pain and prescribed Kadian. (Tr. 188-89). In a follow-up visit on February 11, 2003, Dr. Berry prescribed Kadian. (Tr. 193).

On May 27, 2003, on referral by Disability Determinations, Dr. Michael O'Day, a specialist in occupational medicine, evaluated Claimant. (Tr. 145-47). Claimant reported not currently taking prescription medication. (Tr. 145). Claimant reported pain in his lumbar area resulting from a work-related mishap while welding and years of performing martial arts. Dr. O'Day noted that Claimant had been referred for treatment by Dr. Berry who administered two steroid epidural injections. Surgical intervention was not recommended. Claimant objected to the side effects of narcotic analgesics and discontinued all of his prescriptions. Claimant reported no intention of returning to Dr. Patterson and any doctors for treatment related to his low back pain. Dr. O'Day noted that Claimant remains independently ambulatory. (Tr. 145). Examination revealed some straightening of the lumbar lordosis and tenderness on palpation of the LS S1 area, but no paraspinous muscle spasm. (Tr. 147). Dr. O'Day noted that Claimant's gait is within normal limits, and he is able to heel-toe walk and squat independently. Dr. O'Day opined that Claimant's symptoms of discomfort reflect discogenic origin, but noted that Claimant has no focal neuromotor deficits to the lower extremities, and no definite extradural compression of a lateral

recess exiting nerve. Claimant reported his preference not to take medications because of side effects and discomfort with prolonged standing and walking. Dr. O'Day opined that Claimant could stand and walk for a combined total of four hours a day with appropriate rest periods; could sit for at least six hours a day with appropriate rest periods; could bend and stoop without restriction; and could crouch, squat, and kneel occasionally. Dr. O'Day found Claimant's ability to complete repetitive and applications of foot controls would be feasible but only on a light and occasional basis. (Tr. 147). In the Range of Motion Values, Dr. O'Day determined Claimant to have some restriction in the flexion-extension of his lumbar spine and straight leg raising in the supine position. (Tr. 149).

In the Physical Residual Functional Capacity Assessment completed on June 17, 2003, Deena Exler, a counselor at Disability Determinations, listed herniation L5-S1 as Claimant's primary diagnosis and degenerative disc disease of the lumbar spine as secondary diagnosis. (Tr. 150-57). Ms. Exler indicated that Claimant's exertional limitations included that Claimant could occasionally lift twenty pounds; could frequently lift ten pounds; could stand and/or walk at least two hours in an eight-hour work day; could sit for a total six hours in an eight-hour work day; and was unlimited in pushing and pulling and lifting and/or carrying. (Tr. 151). In support of her conclusions, Ms. Exler noted how the x-ray of his lower spine shows moderate narrowing of T11-12 and T12-L1 and moderate narrowing of L5-S1, and how the MRI shows L4-5 disc dessication with mild bulge. Ms. Exler noted that Claimant has been hospitalized on two occasions, November, 2002, and January, 2003, for intractable back pain and how Claimant has tried physical therapy, epidural injections, and TENS unit for relief of pain. (Tr. 151). Ms. Exler noted that the June, 2003, examination revealed a restricted range of motion and tenderness, but a

normal gait, squat, heel-toe, sensation, and motor. Ms. Exler noted how Claimant alleges excruciating back pain which interferes with all activities, but he has ceased all treatment, including pain medications, and he failed to follow-up with a neurosurgeon despite the appointment being scheduled on his behalf. Thus, Ms. Exler determined that Claimant's allegations of restrictions to be only partially credible. (Tr. 152). Ms. Exler indicated that Claimant's postural limitations included that Claimant could occasionally climb, stoop, and crouch, and frequently balance, kneel, and crawl. (Tr. 152). Ms. Exler further indicated that Claimant no visual, manipulative, or communicative limitations. (Tr. 153-54). Ms. Exler indicated that Claimant has an environmental limitations regarding concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 154). Ms. Exler opined that Dr. O'Day's opinion is largely consistent with her assessment and Claimant's examination findings. (Tr. 156). Ms. Exler indicated that she gave Dr. O'Day's opinion significant weight. (Tr. 156).

In a letter dated July 3, 2003, Dr. Kenneth Smith noted how he examined Claimant on referral by Dr. Berry. (Tr. 185). Examination revealed Claimant to have an antalgic gait and normal reflexes except for mild weakness in both lower limbs. Dr. Smith opined that imaging studies revealed surgery would help and pain management would benefit Claimant. (Tr. 185).

On September 4, 2003, Dr. Cadiz admitted Claimant at Jefferson Memorial Hospital to conduct CBC, ESR, and MRI tests. (Tr. 271-72, 284-85). The CBC and ESR tests were normal. (Tr. 271). Examination revealed tenderness on T7-T8 region and paravertebral area and on L5-S1. (Tr. 286). Dr. Cadiz noted straight leg raising positive on the right at sixty degrees, and forward flexion limited to fifteen degrees. In the impression section, Dr. Cadiz opined that Claimant has severe mid thoracic, low back/sacral pain. (Tr. 286). The MRI of Claimant's spine

showed diffuse disc bulge with minimal compromise of anterior dural sac. (Tr. 271). The MRI of lumbar spine showed focal disc protrusion with compromise of anterior sac and degenerative disc disease. Dr. Anderson conducted a consultation and recommended outpatient therapy with possible disc decompression percutaneously. (Tr. 271). Dr. Cadiz decreased Claimant's OxyContin prescription, prescribed Zoloft and Trazodone, and restricted Claimant's lifting, pushing, and pulling to not over thirty pounds. (Tr. 271-72).

The MRI performed on September 5, 2003, of Claimant's thoracic spine, revealed diffuse disc bulge at T4/T5, T9/T10, and T11/T12 level with minimal compromise of the anterior dural sac and no evidence of narrowing of the spinal canal and neural foramina involvement. (Tr. 168). In the summary, Dr. Smita Parikh, a radiologist, noted minimal osteoarthritis and spur formation at L1 and L2 vertebra with slight narrowing of the disc space between L1/L2. (Tr. 169, 172). Dr. Parikh opined that the loss of disc signal at T11/T12, L4/L5, and L5/S1 was consistent with degenerative changes. (Tr. 170).

On September 5, 2003, Laura Shackelford, an APNC at the Pain Management Center, treated Claimant for his low back pain. (Tr. 275-76). Claimant reported increased pain with activities and feeling better when attending church or lying down. (Tr. 275). During the examination, Claimant remained seated in a wheelchair. (Tr. 276). Nurse Shackelford opined that since Claimant had received epidural injections with no improvement, Claimant would benefit from other treatment measures and suggested percutaneous disc decompression once the MRI results of that morning were reviewed. Nurse Shackelford further opined that she recommended psychiatric consultation and a decrease in his pain medication inasmuch as Claimant increased his OxyContin intake over the last couple of days. (Tr. 276).

The MRI of Claimant's thoracic spine performed on September 5, 2003, revealed diffuse disc bulge at T4/T5, T9/T10, and T11/T12 levels with minimal compromise of the anterior dural sac. (Tr. 279). The MRI of his lumbosacral spine revealed central focal disc protrusion at L4/L5 level with minimal compromise of the anterior dural sac, diffuse disc bulge at T11/T12, L3/L4, and L5/S1, and degenerative changes. (Tr. 280). The MRI of his thoracic spine showed minimal osteoarthritis and spur formation at T11 and T12 vertebra with slight narrowing of disc space between T11/T12. (Tr. 281). The MRI of his lumbosacral spine revealed minimal osteoarthritis, spur formation at L1 and L2 vertebra with slight narrowing of the disc space between L1/L2. (Tr. 281).

On September 16, 2003, on referral by Dr. Cadiz, Dr. Anthony Anderson at the Pain Management Center, assessed Claimant and prepared a consultation report. (Tr. 273-74). Dr. Anderson listed the following medical degenerative disc disease of the lumbar spine, thoracic degenerative disc disease, sub-acute thoracolumbar strain syndrome, severe anxiety/depression, and chronic lumbar strain syndrome with poor posture. (Tr. 273). Claimant reported severe low back pain with severe exacerbation of pain with prolonged sitting of more than thirty minutes or standing. Claimant reported side effects from taking OxyContin while experiencing no relief from the medication. Claimant reported participating in physical therapy several months prior to TENS being considered. Examination revealed tenderness to the spinous processes at L4 and L5 level and to the lower thoracic spine. Dr. Anderson noted that Claimant ambulates with a widened gait with no external support. Dr. Anderson indicated that Claimant demonstrates loss of lumbar lordosis with a protuberant abdomen and fixed lumbar flexion at ten degrees. After discussion with Claimant, Dr. Anderson determined to forgo lumbar discography. (Tr. 273). Dr. Anderson

determined to proceed with a percutaneous disc decompression at the L4 level and to evaluate the

L3 and L5 levels intra-operatively and to consider percutaneous disc decompression via

intradiscal electrocoagulation and nucleoplasty. (Tr. 274). Dr. Anderson further indicated that

Claimant has an associated degree of postural dysfunction requiring physical therapy directed

specifically at spine stabilization. Dr. Anderson recommended discontinuing OxyContin inasmuch

as Claimant has not related any favorable response to narcotic therapy. Dr. Anderson prescribed

Ultracet and increased his Zoloft prescription. Dr. Anderson directed Claimant to return the

lumbar LSO brace for his review to determine if the brace is providing appropriate stabilization.

(Tr. 274).

In a letter dated September 26, 2003, Dr. Cadiz listed severe lumbar pain secondary to

radiculitis and thoracic pain secondary to disc disease as Claimant's diagnosis. (Tr. 165). Dr.

Cadiz noted that physical examination revealed tenderness at L4-5 with L5 and S1 reflexes

diminished on the right. Dr. Cadiz further noted that Claimant has limitation of lumbar flexion

thirty degrees and rotation limited five degrees and extension two degrees. Dr. Cadiz opined that

Claimant's physical functioning is limited to lifting more than ten pounds, pushing or pulling more

than ten pounds, repetitive bending, standing and sitting for more than ten minutes at a time, and

limited crawling or walking up steps. (Tr. 165).

On October 8, 2003, Claimant received treatment at Jefferson Memorial Hospital for

diarrhea and nausea stemming from OxyContin withdrawal. (Tr. 269-70/322, 325-26, 327-28).

On January 27, 2004, on referral by Dr. Cadiz, Dr. Ghazala Hayat, a professor in the

Department of Neurology at St. Louis University, evaluated Claimant for his acute back pain.

(Tr. 265-66). Examination revealed localized tenderness over Claimant's whole spine. (Tr. 266).

Dr. Hayat opined that Claimant's low back pain is probably musculoskeletal and referred Claimant to physical therapy. Dr. Hayat prescribed Tegretol to help control neuropathic pain. (Tr. 266).

In an office visit on February 17, 2004, Claimant reported severe back pain and muscle cramps, and Claimant requested a prescription for pain. (Tr. 264). On March 16, 2004, Dr. Cadiz prescribed Endocet. (Tr. 263).

Claimant sought treatment for neck and back pain in the emergency room at Jefferson Memorial Hospital after being in a motor vehicle accident on April 27, 2004. (Tr. 312-15/258). The CAT scan of Claimant's head performed on April 27, 2004, revealed Claimant's head and brain parenchyma to be within normal limits. (Tr. 256/319, 259/309). The MRI performed on Claimant's spine was a technically poor exam, and the radiologist recommended a repeat examination. (Tr. 260). The MRI of Claimant's lumbar spine revealed a straightening of the lumbar curve and disc space narrowing at L4-L5 and L5-S1. (Tr. 262/320). The radiologist noted some difficulty with patient cooperation. (Tr. 262/320). In the impression section, the radiologist noted a technically poor exam and recommended a repeat exam. (Tr. 321).

On May 6, 2004, Claimant returned to Dr. Cadiz for treatment of his radiculopathy and thoracic pain. (Tr. 261). Dr. Cadiz noted that Claimant ambulating with a cane. Dr. Cadiz prescribed Lorcet and Flexeril. (Tr. 261).

On July 2, 2004, Claimant returned to Dr. Cadiz's office for treatment of his low back pain and for prescription refills. (Tr. 253). Dr. Cadiz ordered a CAT scan of Claimant's spine. (Tr. 253). Dr. Cadiz prescribed Lorcet, Ambien, and Flexeril. (Tr. 250).

The cat scan of Claimant's cervical spine performed on July 23, 2004, revealed that the cervical vertebral bodies appeared to be normally aligned and minimal osteoarthritic changes with

spur formation anteriorly at C5 vertebra. (Tr. 252/308). The MRI further showed no evidence of disc protrusion or spinal stenosis. (Tr. 252/308).

In an office visit on August 3, 2004, Claimant reported increased back pain, and Dr. Cadiz indicated that he would order a MRI. (Tr. 251). Dr. Cadiz prescribed Lortab, Flexeril, and Ambien. (Tr. 242).

Dr. Cadiz scheduled a t-spine MRI to assess Claimant's thoracic pain and radiculopathy in August, 2004. (Tr. 243, 249). The MRI of Claimant's thoracic spine performed on August 30, 2004, revealed normal thoracic alignment, degenerative disc disease, disc narrowing at T4/T5, T7/T8, T8/T9, T9/T10, and T11/T12, small focal posterior left paracentral disc protrusion at T7/T8, and anterior osteophytes. (Tr. 244-46/307). Dr. Mike Raney, the radiologist interpreting the MRI, opined that Claimant has no significant change in the appearance of his thoracic spine since the prior exam. (Tr. 244-46/307).

On September 3, 2004, in a follow-up visit, Claimant reported constant back pain. (Tr. 248). Dr. Cadiz wrote a referral of Claimant to Dr. Rachel Feinberg for thoracic radiculopathy. (Tr. 247). Dr. Cadiz prescribed Lortab and Methocarbamol. (Tr. 241).

On October 1, 2004, Dr. Cadiz completed a Physical Residual Functional Capacity Questionnaire for Claimant's attorney. (Tr. 235-39). Dr. Cadiz noted that he first treated Claimant on September 4, 2003, for cervicalalgia and lumbar radiculopathy. (Tr. 235). Dr. Cadiz listed constant low back pain for the past ten years, neck pain, headaches, and paresthesis of toes as Claimant's symptoms. Dr. Cadiz cited fixed lumbar flexion and tender thoracic paravertebral areas as his clinical findings. Dr. Cadiz opined that Claimant's impairments have lasted and are expected to last at least twelve months. (Tr. 235). Dr. Cadiz indicated that Claimant's exertional

limitations included that Claimant could sit for thirty minutes; could stand for thirty minutes; could sit and/or stand walk about four hours in an eight-hour workday; and could frequently lift less than ten pounds, occasionally lift ten pounds, rarely lift twenty pounds. (Tr. 236-37). Dr. Cadiz opined that Claimant requires period of time during the day where he must walk for five minutes every ten minutes thus he requires a job that permits shifting positions at will from sitting, standing, and walking. (Tr. 237). Dr. Cadiz opined that Claimant would require unscheduled breaks every fifteen minutes for thirty minutes. Dr. Cadiz further indicated that Claimant must use a cane or other assistive device while standing/walking. (Tr. 237). Based on his impairments, Dr. Cadiz opined that Claimant would miss more than four days of work each month. (Tr. 238).

Counsel submitted additional medical records on March 1, 2005, for the Appeals Council's consideration. (Tr. 9-13, 305-30). [2] The MRI of Claimant's lumbar spine performed on February 3, 2005, revealed disc desiccation at L4/L5 with some disc space narrowed at L5/S1, mild posterior disc bulging at L3/L4, posterior disc bulging versus broad based disc protrusion at L4/L5, and subligamentous posterior disc protrusion centrally at T11/T12, subtle. (Tr. 305-06).

## IV.    The ALJ's Decision

The ALJ found that Claimant met the disability insured status requirements on October 2, 2002, the date Claimant alleged he became unable to work, and continued to meet them through the date of the decision. (Tr. 22). The ALJ found that Claimant has not engaged in substantial

---

[2]The undersigned notes that most of the records submitted, with the exception of the radiology report of the MRI of the lumbar spine dated February 3, 2005, were duplicates of the records previously submitted to the ALJ at the time of the hearing. See the emergency room treatment notes dated October 8, 2003 (Tr.267-70, 322-30) and April 27, 2004 (Tr. 256-60, 262, 309-21); and the radiology reports dated July 23, 2004 (Tr. 252/308) and August 30, 2004 (Tr. 244-46/307).

gainful activity since October 2, 2002, the alleged onset date of disability. The ALJ found that the medical evidence establishes that Claimant has severe degenerative disc disease of his lumbar and thoracic spine, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 22).

The ALJ further found that Claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for work that involves lifting and carrying ten pounds frequently and twenty pounds occasionally or standing and/or walking for more than two hours in an eight-hour workday as the exertional limitations. (Tr. 22). The ALJ further found as to the nonexertional limitations, Claimant is limited to occasional climbing, stooping, and crouching, and should avoid concentrated exposure to vibration. The ALJ opined that Claimant is unable to perform his past relevant work as a construction laborer, welder, trash truck driver, hand packer, concrete molder, heavy equipment operator, and fish bailer. The ALJ found that Claimant has the residual functional capacity to perform a full range of light work as reduced by the cited limitations. (Tr. 22). The ALJ further found that Claimant does not have any acquired work skills which are transferable to the skilled or semi-skilled work functions of other work. (Tr. 23).

The ALJ noted that Claimant is a younger individual with the equivalent of a high school education. (Tr. 22). Considering Claimant's exertional capacity for light work, which Claimant is still functionally capable of performing in combination with his age, education, and work experience, the ALJ opined that Claimant is not disabled. (Tr. 23). The ALJ further opined that although Claimant's additional nonexertional limitations do not allow him to perform the full range of sedentary work, there are a significant number of jobs in the national economy which he

could perform including assembler, small parts and production inspector/checker based on the expert vocational testimony provided at the hearing. The ALJ thus concluded that Claimant was not under a disability at any time through the date of his decision. (Tr. 23).

## V. Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is

found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to
        exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the
        claimant's impairments.

6.      The testimony of vocational experts when required which
        is based upon a proper hypothetical question which sets forth the claimant's
        impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ improperly discredited and failed to give controlling weight to his treating physician's opinions.  Claimant also contends that the ALJ failed to properly assess Claimant's credibility regarding his subjective complaints of constant pain.

A.      Weight Given to Dr. Cadiz's Opinions

Claimant contends that the ALJ erred by not giving appropriate weight to Dr. Cadiz's opinions.  See 20 C.F.R. § 404.1527(d)(2) (2005) (requiring the Commissioner to give controlling weight to the opinion of a treating physician if "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence"); Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003).  When a treating source's

opinion is not controlling, it is weighed by the same factors as any other medical opinion: the examining relationship, the treatment relationship, supporting explanations, consistency, specialization, and other factors. See 20 C.F.R. § 404.1527(d). Claimant contends that the ALJ should have accorded more weight to Dr. Cadiz's opinions inasmuch as he was Claimant's treating physician. Claimant contends that the ALJ rejected Dr. Cadiz's opinions because he did not cite objective evidence, his report dated October 1, 2004, was inconsistent with Dr. O'Day's opinion and the non-examining agency opinion.

In the instant cause from September 4, 2003, through September 3, 2004, Dr. Cadiz treated Claimant's cervicalalgia and lumbar radiculopathy. A review of his treatment notes reveals that Dr. Cadiz never found Claimant to have any severe functional limitations with respect to walking, sitting or standing until completing the Physical Residual Functional Capacity Questionnaire ("Questionnaire") on behalf of Claimant at counsel's request on October 1, 2004.[3] The Eighth Circuit has affirmed a decision to allow the ALJ to substitute the opinions of non-treating physicians where the treating physician "renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); see also Goetz v. Barnhart, No. 05-2267, slip op. at 2 (8th Cir. June 2, 2006) (unpub. per curiam) (declining to give controlling weight to the treating physician's opinion because the treating

---

[3]Although Dr. Cadiz in a letter dated September 26, 2003, found Claimant's physical functioning limited to lifting more than ten pounds, pushing or pulling more than ten pounds, repetitive bending, standing and sitting for more than ten minutes at a time, and limited crawling or walking up steps, a review of Dr. Cadiz's treatment notes reveal that he only restricted Claimant's lifting, pushing, and pulling to not over thirty pounds in the discharge summary dated September 6, 2003. See, e.g., Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (a treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given to his opinions).

physician's notes were inconsistent with her residual functioning capacity assessment). In his

decision, the ALJ extensively discussed why he rejected Dr. Cadiz's "profound work-related

limitations" set forth in the Questionnaire and noted that:

> First, Dr. Cadiz's opinion is clearly controverted by substantial evidence in the
> record; that is the findings of Dr. Michael O'Day, as discussed in detail above.
>
> Second, a state agency medical consultant, based on his review of the medical
> evidence, including Dr. O'Day's detailed findings, concluded that the claimant can
> lift and carry ten pounds frequently and twenty pounds occasionally; stand and/or
> walk for at least two hours in an eight-hour workday; sit for about six hours in an
> eight-hour workday, with limited climbing of ramps and stairs and no climbing of
> ladders, ropes or scaffolds and occasional stooping and crouching.
>
> Third, nor did Dr. Cadiz, in his report of October 1, 2004, cite any objective,
> clinical findings which would support the work-related limitations imposed by him.
> Certainly, there is nothing in his treatment records which would support such
> functional limitations.

(Tr. 20)(internal citations omitted).

Dr. Cadiz's opinions were based primarily on Claimant's subjective complaints and were

not supported by clinical and diagnostic techniques or objective medical evidence. Such findings

were inconsistent with other evidence in the record. Cf. Holmstrom v. Massanari, 270 F.3d 715,

721 (8th Cir. 2001)(treating physician's vague and conclusory opinion is not entitled to

deference); see Prosch, 201 F.3d at 1013 (ALJ's decision to discount or even disregard the

opinion of a treating physician will be upheld "where other medical assessments are supported by

better or more thorough medical evidence or where a treating physician renders inconsistent

opinions that undermined the credibility of such opinions")(citations and internal quotation marks

omitted). Indeed, the records from Claimant's treating physician, Dr. Cadiz, do not contain

clinical evidence of a disabling condition during the relevant time period or any restrictions

imposed by Dr. Cadiz based on Claimant's alleged functional limitations. As noted by the ALJ, the objective medical evidence revealed only minimal osteoarthritis with spur formation at the C5 level and repeat MRI studies of Claimant's thoracic and lumbar spine revealed no evidence of frank disc herniation , spinal stenosis, or nerve root impingement. Likewise, Claimant's repeat neurological examinations have not established any significant neurological findings or other objective, clinical findings suggestive of significant pathology consistent with his complaints of intractable pain. Likewise, Dr. Cadiz's conservative treatment of Claimant and the minimal functional limitations previously imposed by him undermine the credibility of the opinions set forth in the Questionnaire. In addition, Dr. Smith, Claimant's treating neurosurgeon, concluded based on Claimant's MRI studies, surgical intervention was not warranted, and his only clinical finding was mild weakness in Claimant's legs. Dr. Smith characterized Claimant's neurological examination as negative for any significant spinal pathology. A review of the record shows no substantive evidence to support Dr. Cadiz's opinions regarding the work-related limitations. Thus, the ALJ's determination not to rely on Dr. Cadiz's opinions as to Claimant's functional limitations was not improper. The substantial evidence on the whole record supports the ALJ's conclusion that Dr. Cadiz's opinions were not entitled to controlling weight.

Opinions from consulting physicians may constitute substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); see Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)(opinion of consulting physician who examines claimant once generally does not constitute substantial evidence). This is especially so when the consulting physicians' opinions are compatible with other medical evidence in the record. Ward v. Heckler, 786 F.2d 844, 847 (8th Cir. 1986). The ALJ found that Dr. O'Day, a specialist in an occupational medicine, based his findings on his

physical examination of Claimant. Greater weight is generally given to the opinion of a specialist about medical issues in the area of speciality, than to the opinion of a non-specialist. See 20 C.F.R. §§ 404.1527(d)(5); 416.927(d)(5). Dr. O'Day observed that Claimant walked with a normal gait, remained independently ambulatory, and was able to toe and heel walk without difficulty and squat independently. Claimant reported discontinuing pain medications because of adverse side effects. Dr. O'Day opined that Claimant's symptoms of discomfort reflect discogenic origin, but noted that Claimant has no focal neuromotor deficits to the lower extremities, and no definite extradural compression of a lateral recess exiting nerve. Dr. O'Day's examination revealed some straightening of the lumbar lordosis and tenderness on palpation of the LS S1 area, but no paraspinous muscle spasm. After examining Claimant, Dr. O'Day opined that Claimant could perform work-related functions such as standing and/or walking for at least four hours in a normal eight-hour day with normal breaks, sitting for six hours in an eight-hour workday with appropriate rest periods, lifting twenty-five pounds occasionally, occasionally crouch, squat, and kneel, and bend and stoop without restriction. Dr. O'Day further found Claimant's ability to complete repetitive and applications of foot controls would be feasible but only on a light and occasional basis.

In addition, the undersigned notes that the ALJ did not rely solely on the opinions of the consulting physician in making his determination. Rather, a review of the decision shows the ALJ to have examined the medical evidence contained in the record as a whole and to have made his determination thereon. See Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). In relevant part, the ALJ opined that Claimant would not experience severe or disabling pain or any other disabling symptoms with the exertional and nonexertional limitations set forth by the state agency

medical consultant. Consistent medical evidence shows Claimant experienced no functional limitations. Dr. Cadiz's treatment consisted of conservative treatment during the relevant period and never imposed any functional limitations until completing the Questionnaire on October 1, 2004, one month after Claimant's last office visit, or found Claimant's functional limitations precluded gainful employment. Finally, the undersigned notes that where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to make. Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000); Beasley v. Califano, 608 F.2d 1162, 1166 (8th Cir. 1979). This is so even when the medical evidence is in conflict. Cantrell, 231 F.3d at 1107; Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)("Where the medical evidence is equally balanced, ... the ALJ resolves the conflict."). "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted).

In the instant case, the ALJ determined to give Dr. Cadiz's opinions neither controlling weight nor much deference. The ALJ gave good reasons for such determinations, and such reasons are supported by substantial evidence on the record as a whole. Dr. Cadiz's opinions were based primarily on Claimant's subjective complaints and were not supported by clinical and diagnostic techniques or objective medical evidence. Where a physician's conclusion appears to rest on a Claimant's subjective complaints, the ALJ is permitted to discredit such conclusion. Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)). As such, a physician's conclusion may be accorded little weight where it is based heavily on a claimant's subjective complaints and is at odds with the weight of objective evidence. See Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999). Moreover, the opinions

contained in the Questionnaire, finding Claimant has extremely severe functional limitations are inconsistent with and not supported by Dr. Cadiz's own treatment notes. The opinions set forth in the Questionnaire are conclusory, not based upon any clinical or laboratory diagnostic techniques, and are not supported by the evidence contained in the record as a whole. See Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995) (physician's conclusory statement without supporting evidence does not amount to substantial evidence of disability); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (per curiam) (physician's opinion must be supported by medically acceptable clinical or diagnostic data). Thus, the ALJ did not err in according Dr. Cadiz's opinions little weight. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

Finally, the undersigned notes that where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to make. Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). This is even so when the medical evidence is in conflict. Id. In the instant cause, the ALJ gave good reasons to discount the functional limitations rendered by Dr. Cadiz inasmuch as his opinions and functional limitations were not supported by substantial medical evidence on the record as a whole.

B.     Credibility Determination

Claimant also contends that the ALJ failed to properly assess Claimant's credibility regarding his subjective complaints of constant pain.

The determination of Claimant's credibility is for the Commissioner, and not the Court, to decide. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). The ALJ may not discredit Claimant's complaints of pain solely because they are unsupported by objective medical evidence. Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Instead, the ALJ must also consider all of the evidence relating to the claimant's relevant work history, the absence of objective medical evidence to support the complaints, and third party observations as to:

1. claimant's daily activities;

2. duration, frequency and intensity of the pain/condition;

3. dosage, effectiveness, and side effects of medication;

4. precipitating and aggravating factors; and

5. functional restrictions.

Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (stating factors from Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).

The undersigned recognizes that pain itself may be disabling. See Loving v. Department of Health & Human Servs., 16 F.3d 967, 970 (8th Cir. 1994). However, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." Jones, 86 F.3d at 826. While there is no doubt that claimant experiences pain, the more important question is how severe the pain is. Gowell, 242 F.3d at 796; Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

When determining a claimant's complaints of pain, the ALJ may disbelieve such complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. The

ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); see also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810, 813 (8th Cir. 1989). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, his decision should be upheld. Browning, 958 F.2d at 821. However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically. The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); see also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). The ALJ's credibility findings are entitled to deference. See Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to credibility determination).

In his decision the ALJ thoroughly discussed the medical evidence of record, the lack of ongoing medical evidence corroborating Claimant's subjective complaints of constant pain, the decision by Claimant to discontinue narcotic pain relievers, his activities, and the testimony adduced at the hearing, including claimant's vague testimony regarding the status of his Workers Compensation claim. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The lack of objective medical basis to support Claimant's subjective descriptions is an important

factor the ALJ should consider when evaluating those complaints.  See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).  The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints of constant pain were not credible.

Specifically, the ALJ noted that no treating physician stated that Claimant was disabled or unable to work except for the limited time frames set forth by Dr. Patterson in the certificates not to work.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints).  In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on his daily activities, or functional or physical limitations.  The ALJ  noted how the medical record is devoid of any evidence showing that Claimant's condition had deteriorated or required aggressive medical treatment.  Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition). The ALJ noted that there is no medical evidence showing that Claimant required surgery.  The ALJ further determined that at one time, Claimant decided to discontinue taking narcotic pain relievers.  See Masterson v. Barnhart, 363 F.3d 731, 739 (8th

Cir. 2004) (ALJ properly considered that claimant did not take narcotic pain medication in finding her complaint of extreme pain not credible).  Further, the ALJ noted that Claimant was vague in his response to his questions regarding the current status of his pending Workers Compensation claim.  Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (appropriate for ALJ to consider personal observations made during hearing when determining credibility of claimant).  These observations are supported by substantial evidence on the record as a whole.

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility.  See Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, the courts normally defer to his credibility determination).  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility.  Those included Claimant's choice to discontinue taking narcotic pain relievers at one time, his lack of work restrictions by any physicians, his testimony at the hearing, and his activities including fishing, caring for his son, and attending two-hour church services.  The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination.  Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).  Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints of constant pain.  See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level

of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

C.      Post-Hearing Medical Records

The undersigned finds that the additional medical records submitted by the Claimant do not alter the outcome of this opinion. Indeed, the undersigned notes that these records were part of the record before the Appeals Council prior to the Appeals Council finding no basis for changing the ALJ's decision and denying claimant's request for review of the ALJ's decision. (Tr. 5-7A). Further, a review of the record reflects that all of the additional medical records, with the exception of the radiology report of the MRI of the lumbar spine dated February 3, 2005, were duplicate submissions already in the record. Thus, the undersigned finds that the treatment notes add nothing new to the record regarding Claimant's back pain and alleged disability.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning, 958 F2d at 821.

Accordingly, the decision of the ALJ denying claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that Claimant's complaint be dismissed with prejudice.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal the questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


Dated this _8th_ day of September, 2006.

/s/ Terry I. Adelman

UNITED STATES MAGISTRATE JUDGE